NOT DESIGNATED FOR PUBLICATION

No. 118,415

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of
K'L.V.P.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; DANIEL CAHILL, judge. Opinion filed June 29, 2018.
Affirmed.

*Christopher Cuevas*, of Kansas City, for appellant natural mother.

*Crystal Elaine Ellison*, assistant district attorney, *Mark A. Dupree Sr.*, district attorney, and *Derek
Schmidt*, attorney general, for appellee.

Before STANDRIDGE, P.J., GREEN and MCANANY, JJ.

PER CURIAM: Mother, the natural parent of K'L.V.P., born in 2008, appeals from
the district court's decision to terminate her parental rights. Mother contends the district
court erred in finding that she was unfit, that her condition of unfitness was unlikely to
change in the foreseeable future, and that termination of her parental rights was in
K'L.V.P.'s best interests. Finding no error, we affirm.

FACTS

The State of Kansas filed a petition to declare K'L.V.P. a child in need of care on
April 15, 2014. According to the petition, the Kansas Department for Children and
Families (DCF) received notification from Child Protective Services (CPS) in El Paso,

1

Texas, that K'L.V.P. had been removed from Mother's custody. Mother told CPS that she had no family in Texas and that all of her family members resided in Kansas.

The CPS employee reported that Mother left K'L.V.P., who was five years old, alone in a hotel room in El Paso. At the time, Mother's employment was to travel from state to state selling cleaning products. K'L.V.P.'s aunt, who lived in Kansas, called the hotel room and K'L.V.P. told the aunt that she was in the room by herself. The aunt stayed on the phone with K'L.V.P. until Mother returned an hour and a half later. In the report, the CPS employee expressed concern that Mother had a substance abuse problem because Mother admitted to daily marijuana use and tested positive for cocaine and amphetamines while in Texas.

Because Mother threatened to leave El Paso with K'L.V.P., CPS initiated proceedings to effect an emergency removal from Mother's custody and temporarily place the child in state custody, which occurred on February 13, 2014. Mother had one visit with K'L.V.P. before she left El Paso to travel to Arizona. CPS arranged telephone visitations between Mother and K'L.V.P., but those visits were terminated because Mother was "inappropriate" with K'L.V.P. and with the foster parents supervising the visits.

Given all significant members of K'L.V.P.'s family lived in Kansas City, Kansas, the district court in El Paso, Texas, entered an order on March 3, 2014, transferring venue in this matter to Wyandotte County, Kansas. When the State filed its petition to declare K'L.V.P. a child in need of care, Mother was in Utah but was planning to return to Kansas.

On April 17, 2014, the district court ordered that K'L.V.P. be placed in out-of-home custody with DCF. On July 25, 2014, the court adjudicated K'L.V.P. a child in need of care. The judge issued interim orders, requiring Mother to maintain stable income and

2

housing, participate in parenting classes, submit to random urinalysis (UA) tests, contact her court services officer (CSO) once per month, and participate in family and mental health assessments and follow their recommendations.

Over the next six months, the district court held several review hearings to assess Mother's progress and determine if reintegration was a viable option. Mother appeared to make "adequate" progress on her case plan, but she hit some setbacks. Mother took the mental health and drug and alcohol assessments, submitted a negative UA result, and attended some parenting classes. But in December 2014, Mother was charged with possession of cocaine. In the journal entry documenting the January 2015 permanency hearing—the third hearing to review Mother's progress in the record—the court noted that Mother had made no progress toward reintegration and had failed to maintain contact with her CSO as required.

On March 26, 2015, the State filed its first motion to terminate Mother's parental rights. The State alleged that Mother's contact with her Kaw Valley Center (KVC) case manager and visitation with K'L.V.P. were inconsistent and that Mother had not been in contact with her CSO since November 17, 2014. At the time the petition was filed, Mother's criminal case for possession of cocaine had been continued to March 31, 2015. Noting that K'L.V.P. already had been in foster care for 13 months, the State recommended termination based on Mother's lack of compliance with the court orders and lack of contact with K'L.V.P. Based on our review of the record, it appears the court never addressed the March 26, 2015 motion to terminate.

The district court held review hearings in December 2015, January 2016, May 2016, and August 2016. During some portion of this time period, Mother lived with her boyfriend in Missouri. Their residence was not approved as a potential placement option for K'L.V.P. because of Mother's and the boyfriend's "legal issues." Mother had a jury trial scheduled for March 2016 (the charges were not specified in the record), and she

tested positive for marijuana in May 2016 while on diversion. The court ordered Mother to "resolve her legal issues and provide verification" that she had done so.

On August 26, 2016, the State filed a second motion to terminate Mother's parental rights. It alleged Mother had failed to secure stable employment or a stable place to live. At the time the motion was filed, Mother was intermittently employed and had moved in with her father, but his home had not been inspected by KVC. The State further alleged that Mother inconsistently attended her supervised visits with K'L.V.P.: Mother missed several visits, elected to conduct some visits by phone rather than in person, and arrived late for one visit due to lack of transportation. Meanwhile, K'L.V.P. had been diagnosed with posttraumatic stress disorder and became upset when Mother failed to attend their family therapy sessions without an excuse. The State also noted that Mother was on diversion for the December 2014 possession of cocaine charge and, while on diversion, tested positive for marijuana. At the time of the second motion, the case had been open for two years and four months. As with the March 26, 2015 motion to terminate, we find no indication that the court ever addressed the August 26, 2015 motion to terminate.

The district court held a permanency review hearing on December 15, 2016. Although noting Mother continued to make some progress toward reintegration, the court ordered Mother to take a Safe Kids assessment and follow its recommendations. The journal entry from an April 3, 2017 review hearing noted the same recommendations.

On April 4, 2017, the State filed an amended motion for termination of parental rights. This amended motion relied on the same facts as the August 2016 motion to support termination. In addition, however, the April 4, 2017 motion put Mother on notice that the State intended to establish a presumption of unfitness under K.S.A. 2017 Supp. 38-2271(a)(6) because K'L.V.P. had been in out-of-home placement for over two years.

4

The district court held a termination hearing on August 29, 2017, at which several of Mother's social workers testified about Mother's progress in complying with the court's orders. After hearing the evidence and argument of counsel, the court granted the State's motion and terminated Mother's parental rights. Mother appeals.

STANDARD OF REVIEW

Before terminating parental rights, the district court must find the State proved by clear and convincing evidence that the parent is unfit and the conduct or condition which renders the parent unfit is unlikely to change in the foreseeable future and by preponderance of evidence that termination of parental rights is in the best interests of the child. K.S.A. 2017 Supp. 38-2269(a), (g)(1).

In reviewing a district court's decision terminating parental rights, an appellate court must consider "whether, after review of all the evidence, viewed in the light most favorable to the State, it is convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence, that [the parent's rights should be terminated]." *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008). Clear and convincing evidence is "an intermediate standard of proof between a preponderance of the evidence and beyond a reasonable doubt." 286 Kan. at 691. Appellate courts do not reweigh the evidence, judge the credibility of witnesses, or redetermine questions of fact. 286 Kan. at 705.

ANALYSIS

On appeal, Mother argues the district court improperly terminated her parental rights. Specifically, Mother claims there is insufficient evidence in the record for the court to have found by clear and convincing evidence that she is unfit by reason of conduct or condition which renders her unable to care properly for K'L.V.P. and that the

5

conduct or condition is unlikely to change in the foreseeable future. See K.S.A. 2017 Supp. 38-2269(a). Mother also claims there is insufficient evidence in the record for the court to find that it was in K'L.V.P.'s best interests to terminate her parental rights. See K.S.A. 2017 Supp. 38-2269(g)(1).

Alternatively, Mother claims there is insufficient evidence in the record to support the presumption that she was unfit under K.S.A. 2017 Supp. 38-2271(b)(6).

*K.S.A. 2017 Supp. 38-2269*

Mother first claims the district court erred in holding she was unfit to parent K'L.V.P. Ordinarily, the district court evaluates whether a parent is unfit by considering a nonexclusive list of factors in K.S.A. 2017 Supp. 38-2269(b) and (c). Any one of the factors standing alone may—but does not necessarily—provide sufficient grounds for termination. K.S.A. 2017 Supp. 38-2269(f).

In this case, the district court relied on the following three statutory factors to find Mother unfit:

1. The agency made reasonable efforts to rehabilitate the family but such efforts were unsuccessful. K.S.A. 2017 Supp. 38-2269(b)(7);
2. Mother failed to make reasonable efforts to adjust her circumstances, conduct, or conditions to meet the needs of the child. K.S.A. 2017 Supp. 38-2269(b)(8);
3. Mother failed to carry out a reasonable plan—approved by the court—that was directed toward the reintegration of the child into Mother's home. K.S.A. 2017 Supp. 38-2269(c)(3).

Thus, the question presented is whether the district court's findings on one or more of these factors are supported by clear and convincing evidence. We begin our analysis

6

with tasks set forth in the reintegration plan as approved by the court, which included orders for Mother:

- to sign all necessary releases of information for the CSO;
- to obtain a mental health assessment and follow all recommendations;
- to obtain an initial/family assessment and participate in parenting classes;
- to obtain and/or maintain stable income and housing;
- to contact the assigned CSO once a month;
- to contact the assigned CSO prior to address or telephone changes;
- to submit timely, random, and negative UA test results;
- to complete a drug and alcohol assessment and follow all recommendations; and
- to participate in KVC supervised visitation with K'L.V.P.

*Releases, assessments, and parenting classes*

Rachel Nalley worked for two years as Mother's case manager at KVC Behavioral Health. Nalley testified at the termination hearing about Mother's progress on her case plan. Nalley met with Mother at least 20 times in person, in addition to maintaining contact with Mother by phone. Nalley reviewed the court orders and reintegration plan with Mother each time they met. Nalley acknowledged that Mother signed all the necessary releases of information for the CSO. In a journal entry documenting the January 2015 permanency hearing, however, the court noted that Mother failed to maintain contact with her CSO as ordered. Nalley also confirmed that Mother participated in a mental health assessment at Wyandot Mental Health Center with Linda Gates on January 11, 2016. No recommendations were made for Mother as a result of the mental health assessment.

The record reflects that Mother took the family assessment and completed 20 hours of parenting classes during the first six months after K'L.V.P. was adjudicated a

child in need of care. At a permanency hearing held on December 15, 2016, however, the court ordered Mother to enroll in and complete a specific parenting class, the Safe Kids program. Mother started the program on April 26, 2017. Cynthia Moses, Clinical Director at Transitions Counseling Services, led the Safe Kids program that Mother attended. Moses testified that Mother completed the initial Safe Kids assessment but that Mother failed to successfully complete the program. Mother admits she missed 9 of the 18 group sessions held before the termination hearing but contends that the only reason she missed the classes was because she did not have enough money to pay for them. Moses confirmed that Mother had difficulty paying for the classes. But Moses also testified that Transitions "bent over backwards" to work with Mother to pay for the classes—it offered her a payment plan, allowed her to make payments toward the plan as she was able from session to session, and applied past payments to future classes so that she could attend as many sessions as possible. Yet even with that assistance, Mother did not attend regularly. The district court did not believe that poverty was the reason Mother failed to complete Safe Kids. The court said that the "kicker" to Mother's argument was that one week prior to the termination hearing, Mother failed to attend group session without cancelling or making a poverty request:  "She just did not go."

Moreover, the record shows that even when Mother attended group sessions, she made minimal progress toward meeting her Safe Kids goals. When Mother did attend the classes, she was disruptive and did not engage with the course work. Moses reported that Mother complained about KVC and the court and refused to take responsibility for her child being taken into custody. Moses testified that Mother only started making progress toward some of her Safe Kids goals in the four most recent classes prior to the termination hearing, but even then she was not disclosing information in the group sessions that would help address her issues. Moses concluded that Mother's limited progress was inadequate for her to recommend reintegration.

*Stable housing and stable income*

With regard to stable housing, Mother lived with her boyfriend in Missouri at various points during 2015 and 2016. Their residence was not approved as a potential placement option for K'L.V.P. At the time of the termination hearing in August 2017, Mother claimed to be living with her father. Jessica Dixon, a supervisor at KVC, performed a walk-through of the house. She testified that K'L.V.P's room had a full-size bed and the walls were decorated with deflated balloons from previous birthdays. Dixon did not observe any clothes or a dresser in K'L.V.P.'s room. Dixon described Mother's room as an entryway in the back of a concrete, unfinished basement with no lights. There was a king-size mattress with no sheets on the floor, a nightstand, and boxes that appeared to be for storage. There was one woman's shirt or dress laid out; all other clothes in the room appeared to be men's clothes in a trash bag. Mother explained to Dixon that they were her brother's clothes. Although Dixon testified that the house was appropriate and not dangerous, the absence of any of Mother's personal belongings led Dixon to conclude that Mother did not actually live there. Nalley also expressed concern about whether Mother lived at the house. Although K'L.V.P. reported to Nalley that Mother was moving, Mother presented no evidence to establish that she actually was making an attempt to secure alternative housing. Nalley stated that KVC's goal was for parents to actively seek stable, long-term housing for their children.

With regard to stable employment, Nalley testified Mother had at least four different employers while the case was pending, which caused Nalley to be concerned that Mother was unable to keep employment for a stable amount of time, which was at least a year. Nalley stated that Mother would provide paycheck stubs that showed work at a company for only one to two months at a time but never longer than that. Mother argues Nalley's testimony about her employment was irrelevant because Mother was employed at the time of the termination hearing. Notably, however, Nalley acknowledged that Mother was able to maintain income; her concern was that it was inconsistent due to the

9

fact that Mother frequently changed jobs. The fact that Mother was employed at the time of the hearing did not ameliorate this concern.

*Drug tests*

Mother tested positive for cocaine and amphetamines in February 2014, while in Texas. In December 2014, after K'L.V.P.'s case was transferred to Kansas, Mother was charged with possession of cocaine in Kansas. In May 2016—while on diversion for the December 2014 possession of cocaine charge—Mother tested positive for marijuana. Ashley Brown, an Intensive Supervision Officer for Community Corrections, supervised Mother's diversion for her December 2014 possession of cocaine charge. Brown testified that Mother was subject to random UA tests as part of her diversion. Brown reported that Mother tested positive for marijuana in May 2016, while on diversion in the December 2014 case. Brown also reported, however, that Mother had 15 negative random UA tests afterwards. Mother's diversion case was successfully closed in August 2017.

Rachel Stompoly, a KVC employee, testified that Mother's UA test result on August 1, 2017, tested positive for methamphetamines and faint for PCP. Mother immediately disagreed with the results and wanted to get retested. Stompoly told Mother that she could wait 30 minutes and take another test, but Mother did not return during that time. Nalley testified that she gave Mother other options to get retested the same day, including contacting her diversion officer or CSO to get retested or go to a lab and pay to get retested.

*Visitation*

One of Nalley's biggest concerns was Mother's inconsistency regarding visitations with K'L.V.P. Nalley testified that she helped Mother achieve unsupervised and extended visitations with K'L.V.P. on three separate occasions in 2017, but Mother violated a

condition of the parenting safety plan during each of the visits, which required Mother to revert back to supervised visits. Mother had not yet made it to the point where she could have K'L.V.P. for overnight visitation.

Mother attended 57 out of the 77 possible visits with K'L.V.P. at the time of the hearing. Nalley candidly acknowledged that not all of the 20 missed visits were Mother's fault. But Nalley informed the district court that her concern was less about Mother's attendance at the visits and more about Mother's behavior with K'L.V.P. Nalley testified she was concerned about Mother's ability to make appropriate parenting decisions and supervise K'L.V.P. For example, Mother's "safety plan" required her to obtain KVC approval for adults who would be in contact with K'L.V.P. Nalley recounted an instance in which Mother arrived to pick K'L.V.P. up for a visit in a vehicle driven by a person unknown to KVC, in violation of the safety plan. K'L.V.P.'s placement family also reported observing Mother arriving for a visit as a passenger in a car driven by a person who had not been subject to the background checks required before such person would be able to drive with K'L.V.P. as a passenger. Based on these and some other incidents, Nalley recommended the court order Mother to take the Safe Kids assessment and follow any recommendations.

As did the district court, we find the facts set forth above constitute clear and convincing evidence that KVC made reasonable efforts to rehabilitate the family, which were not successful (K.S.A. 2017 Supp. 38-2269[b][7]); that Mother failed to make reasonable efforts to adjust her circumstances, conduct, or conditions to meet K'L.V.P.'s needs (K.S.A. 2017 Supp. 38-2269[b][8]); and that Mother failed to carry out a reasonable plan—approved by the court—directed toward the reintegration of the child into Mother's home (K.S.A. 2017 Supp. 38-2269[c][3]). Accordingly, the district court did not err in finding Mother unfit.

11

Having found sufficient evidence to support the district court's finding that Mother was unfit, we now must determine whether there is clear and convincing evidence to support the district court's finding that the conduct or condition which rendered Mother unfit is unlikely to change in the foreseeable future. Mother argues that the district court erred because her situation had already changed by the time of the termination hearing: "She had a good job, a place to stay, and did great on her court orders." Mother also asserted that she successfully completed diversion for a drug case, which Mother asserts is "concrete evidence her situation has changed."

But the test is not whether Mother was making positive steps toward accomplishing the goals set forth in her case plan. Rather, it is whether she has the ability to actually accomplish—in the foreseeable future—the tasks necessary for reunification. The district court found KVC had exhausted its resources for over three years to help Mother achieve reintegration, and there was "nothing in the evidence that leads this Court to a conclusion that that can happen any time in the foreseeable future with the mother." By the August 2017 termination hearing, the State had filed two prior motions to terminate Mother's parental rights, and the court gave Mother additional opportunities to work toward integration. Nalley testified that every time the case plan appeared to be going appropriately and visitations between Mother and K'L.V.P. progressed, Mother hit a setback. The district court judge stated that "given the track record that I've seen over the last three years . . . I could foresee this going on for the rest of [K'L.V.P.]'s minority where mom didn't really fall off the map, didn't stop doing everything, but also was not in a position to reunify with [K'L.V.P.]." A court may predict a parent's future unfitness based on his or her past history. *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982). Moreover, "[a] parent's actions, not intentions, are the measure to be used in determining likelihood of change in the foreseeable future." *In re M.H.*, No. 117,127, 2017 WL 5951684, at *4 (Kan. App. 2017) (unpublished opinion), *rev. denied* 307 Kan. ___ (April 27, 2018).

Children experience the passage of time differently than adults. K.S.A. 2017 Supp. 38-2201(b)(4). K'L.V.P. was five years old when she was removed from Mother's care in February 2014. Mother had been working on a case plan with DCF for over three years at the time of the termination hearing—which was over one-third of K'L.V.P.'s life. The court held K'L.V.P. needed to have permanency. We find clear and convincing evidence in the record to support the district court's finding that the conduct or condition which rendered Mother unfit is unlikely to change in the foreseeable future.

Finally, we must determine whether there is a preponderance of the evidence to support the district court's finding that termination of parental rights is in K'L.V.P.'s best interests. K.S.A. 2017 Supp. 38-2269(g)(1); *In re R.S.*, 50 Kan. App. 2d 1105, 1115-16, 336 P.3d 903 (2014). In making this determination, the court gives primary consideration to the physical, mental, and emotional needs of the child. K.S.A. 2017 Supp. 38-2269(g)(1).

> "[T]he court must weigh the benefits of permanency for the children without the presence of their parent against the continued presence of the parent and the attendant issues created for the children's lives. In making such a determination, we believe the court must consider the nature and strength of the relationships between children and parent and the trauma that may be caused to the children by termination, weighing these considerations against a further delay in permanency for the children." *In re K.R.*, 43 Kan. App. 2d 891, 904, 233 P.3d 746 (2010).

Mother contends that termination of her parental rights was not in K'L.V.P.'s best interests. This court reviews a district court's decision for an abuse of discretion. *In re R.S.*, 50 Kan. App. 2d at 1116. An abuse of discretion occurs when no reasonable person would agree with the district court or if the court bases its decision on an error of fact or law. 50 Kan. App. 2d 1105, Syl. ¶ 2.

13

Mother asserts the evidence was undisputed that she loved K'L.V.P. and was bonded with her. Indeed, Nalley testified that K'L.V.P. was bonded with Mother, which made it difficult for her to recommend termination. But Nalley described it "more of a—a friend kind of bond and—or like a bigger sister kind of bond versus a parent and a child bond" and testified that it is in K'L.V.P.'s best interests to have a parent-child bond.

The district court also took the mother-daughter bond into consideration in its decision. But the court held:

> "So what are we to do? If this evidence is such that there is a good bond and that mom has done some things and shown some progress, why not give her more time, let her get it done? Well, because we have the sense of child time.
> "As was pointed out in the evidence, [K'L.V.P.] has now spent a third of her life in a state of nonpermanence. Will I go home to mom? Who is going to raise me? Where am I going to go to school? You know, should I make friends with my—people in my class, because I am going to stay here, or am I going to be moved? What's going to happen to me?
> "It's unthinkable to do this to a child for three years."

The district court did not err. As stated by our court in *In re A.A.*, 38 Kan. App. 2d 1100, 1105, 176 P.3d 237 (2008):

> "Cases like this are difficult ones. A parent may be labeled 'unfit' under the law even though he or she loves the child and wants to do the right thing, which may be the case here. But we must judge these cases based mostly upon actions, not intentions, and we must keep in mind that a child deserves to have some final resolution within a time frame that is appropriate from that child's sense of time."

A reasonable person could agree with the district court that it was in K'L.V.P.'s best interests to terminate Mother's parental rights. While the testimony showed that Mother and K'L.V.P. loved each other and were bonded, the evidence revealed that

14

Mother could not make the necessary life changes to properly care for her daughter. Based on the record in its entirety, Mother has failed to show that the district court abused its discretion by finding it was in K'L.V.P.'s best interests to terminate Mother's parental rights.

*K.S.A. 2017 Supp. 38-2271(a)(6)*

Both in its motion and at the termination hearing, the State argued that Mother was presumed unfit to parent under K.S.A. 2017 Supp. 38-2271(a)(6) because K'L.V.P. had been in out-of-home placement for longer than two years, Mother failed to carry out a reasonable plan for reintegration, and there was a substantial probability Mother would not carry out the plan in the near future. On appeal, Mother acknowledges that the first element under the presumption has been met: K'L.V.P. has been in out-of-home placement for over two years. Mother challenges the district court's finding that she failed to carry out a reasonable plan for reintegration and that there is a substantial probability that she will not complete the plan in the near future.

For the reasons set forth in the preceding section, we find clear and convincing evidence that Mother failed to carry out a reasonable plan for reintegration and that there exists a substantial probability that Mother will not complete the plan in the near future. Nevertheless, we need not examine whether Mother successfully rebutted the presumption of unfitness. This is because we already have found clear and convincing evidence of the factors necessary to terminate parental rights under K.S.A. 2017 Supp. 38-2269(a): that Mother is unfit, the conduct or condition which renders Mother unfit is unlikely to change in the foreseeable future, and under 38-2269(g)(1) that termination of parental rights is in the best interests of the child.

Affirmed.

15